**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| JULIE MITCHELL, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) Case No. 19-cv-2289-JAR |
| | ) |
| DEPUY ORTHOPAEDICS, INC., et al., | ) |
| | ) |
| Defendants. | ) |

**AGREED ORDER FOR THE PRODUCTION OF HARDCOPY DOCUMENTS AND**
**ELECTRONICALLY STORED INFORMATION**

The Parties hereby agree to the following protocol for production of electronically stored information ("ESI") and paper ("hardcopy") documents.[1] Subject to protective orders in this Action, this protocol governs all productions in this matter. This protocol has the objective to facilitate the just, speedy and cost-efficient discovery of ESI and hardcopy documents and to promote, whenever possible, the early resolution of disputes, including any disputes pertaining to scope or costs, regarding the discovery of ESI without Court intervention. Nothing in this protocol shall limit a Party's right to seek or object to discovery as set out in applicable rules, to rely on any protective order entered in this Action concerning protection of confidential or otherwise sensitive information, or to object to the authenticity or admissibility of any hardcopy document or ESI produced in accordance with this protocol. The mere production of ESI as part of a mass production shall not itself constitute a waiver for any purpose.

**A.  GENERAL AGREEMENTS**

1.  Ongoing Cooperation Among the Parties

---

[1] Production of Plaintiff's medical records is not within the scope of this protocol. Such records shall be produced in .pdf format unless the parties agree to a different format.

The Parties commit to cooperate reasonably and in good faith throughout the matter regarding the production of ESI and hardcopy materials as discovery proceeds. The Parties acknowledge that an attorney's zealous representation of a client is not compromised by conducting discovery in a reasonable and cooperative manner.

When circumstances arise that are not contemplated by the terms of this Order, or if uncertainty arises concerning the intended application of its terms, a Producing Party should initiate the meet and confer process prior to expending material resources on a unilaterally conceived discovery protocol. A Producing Party shall avoid production protocols that unnecessarily diminish a requesting party's ability to search, retrieve, classify, organize or use ESI.

2.    E-Discovery Liaisons

Each Party will identify an E-discovery Liaison who will be primarily responsible for meeting and conferring concerning ESI. Each E-discovery Liaison will:

a.    be knowledgeable about the Party's e-discovery efforts;

b.    be, or have reasonable access to those who are, familiar with the Party's electronic systems and capabilities in order to explain those systems and answer relevant questions; and

c.    be, or have reasonable access to those who are, knowledgeable about the technical aspects of e-discovery, including electronic document storage, organization, and format issues, and relevant information retrieval technology, including search methodology.

Each Party will notify the other of any changes of its designated E-discovery Liaison.

3.    Exchange of ESI-Related Information

By December 15, 2019, Defendants shall provide Plaintiff in writing the information listed in items (a) through (g) below. The Parties agree and understand that Defendants' disclosures are based on their knowledge and understanding as of the date of the response, and Defendants agree to amend or supplement the responses in a timely manner if they learn that in some material respect their responses are incomplete or incorrect. Additionally, nothing about Defendants' disclosure restricts Plaintiff's ability or right to request in writing additional information and/or production on newly identified custodians or any other matter subject to this Order and Defendants' ability or right to object to same.

a.      Custodians:

A written list of the likely Custodians (including current and former employees) of relevant information, including, for individual Custodians, a brief description of each person's title, responsibilities, years of service, and the department in which that individual worked; for departmental Custodians, a brief description of each identified departmental Custodian; and for shared-resource Custodians, a brief description of that resource. Additional, reasonably available information sufficiently detailed to enable the requesting Party to evaluate the Producing Party's list of Custodians, including, but not limited to, a Producing Party's organization chart(s) (or other similar information if no such charts exist) sufficient to show the company's structure, including departments and personnel, by title/position or name, within such departments for the period relevant to the claims and defenses. Plaintiff may request additional Custodians or sources after such initial disclosure and Defendants reserve their right to object to such requests;

b.      Sources of Electronic Communications:

A written list of each electronic communication system (including archival, proprietary and legacy systems) that is reasonably likely to contain Discoverable Information and that has been in place at all relevant times and a general description of each such system, including the nature, scope, character, organization and format employed in each system.

c.      Non-Custodial Sources of Information:

A list and general description of the key non-custodial sources of information that would be reasonably expected to contain discoverable information, whether the ESI in those systems is already segregated such that an electronic search is not necessary, and whether such systems or their structure is anticipated to pose any technological challenges to implementing a search protocol. For those sources identified, the Party shall provide the following information (to the extent that it is reasonably available):

1.      Information Source Name;

2.      Type of Source;

3.      Software Platform;

4.      Software Version;

5.      Business Purpose;

6.      System/Business Owners (primary users of database);

7.      Whether Database is on premises or cloud-based;

8.      Field List within the scope of permissible discovery, including, but not limited to: Database field names, Database field values and codes, Database input constraints, Database Auto Filled Fields;

If the Producing Party claims that a Non-Custodial Source(s) that it reasonably believes would contain unique responsive information is not reasonably accessible, it shall

identify such non-custodial source and will meet and confer to address the appropriate information to provide in order to support such claim.  In addition, the Parties will meet and confer to discuss Field Definitions (including field type, size and use) within the scope of permissible discovery.

c.      A general description of and a copy of the operative document retention policies, practices and procedures throughout the relevant time period, pertaining to known data within the scope of discovery;

d.      The name of the individual responsible for the Producing Party's electronic document retention policies ("the retention coordinator");

e.      A description of unique, non-duplicative ESI within the scope of discovery that the Party is aware of having been lost or destroyed after legal hold obligations in this case have been triggered, if any;

f.      The intended method or methods of collection of ESI from the Custodians and locations discussed in this Order, including whether such intended method or methods will (1) alter or affect in any way the ESI, including its metadata, (2) capture all ESI from a Custodian or resident at identified locations, and (3) if it will not capture all ESI from a Custodian or resident at identified locations, what ESI it intends to collect and how it will determine the ESI to be collected.

g.      A description of any ESI within the scope of discovery that the Party contends is inaccessible or only of limited accessibility and, hence, not producible by that Party without undue burden and/or expense, including:

i.      the reasons for the Party's contention regarding accessibility; and

  ii. the proposed capture and retrieval process available (if any) for identification and/or recovery of the information deemed inaccessible (including cost estimates if readily available).

4. <u>Search of Discoverable Information for Production:</u>

The Parties must discuss the method or methods of search of ESI as part of the meet-and-confer process pursuant to this Order. The purpose of this requirement is to ensure an appropriate degree of transparency with respect to information relating to methods for the search of ESI for purposes of identification and production. To the extent the parties are unable to resolve any disagreements regarding search methodologies through the meet-and-confer process, the parties shall raise such issues with the Court.

To the extent the Producing Party identifies, during its collection or review, any Document that it knows to be responsive yet which, for any reason, falls outside of the agreed upon search methodology or is not captured by the search procedure, the Producing Party must produce all such responsive, non-privileged Documents.

5. <u>Proportionality</u>

  a. <u>Proportional Scope of Discovery</u>. Consistent with the proportionality standard set forth in Federal Rule of Civil Procedure 26(b)(1), the Parties agree to cooperate in identifying an appropriate scope of discovery, including the sequence of discovery, relevant custodians, discoverable data sources, the relevant time period, and the scope of requests for production, including, but not limited to, the scope of requests for emails.

  b. <u>Non-Discoverable ESI</u>. Consistent with the proportionality standard, and absent a Party's specific written notice for good cause, the following is a non-comprehensive list of categories of ESI that are presumed to not be within the scope

of discovery.  If the Producing Party identifies categories of ESI that contain unique responsive information that it believes are outside the scope of discovery, it will identify such categories and the parties shall meet and confer regarding those categories and address any areas of disagreement with the Court.:

i.    Deleted, "slack," fragmented, or unallocated data only accessible by forensics;

ii.   Random access memory (RAM), temporary files, or other ephemeral data that are difficult to preserve without disabling the operating system;

iii.  On-line access data such as (without limitation) temporary internet files, history files, cache files and cookies;

iv.   Server, system, network or software application logs;

v.    Electronic data temporarily stored by laboratory equipment or attached electronic equipment, provided that such data is not ordinarily preserved as part of a laboratory report;

vi.   Files included on the National Institute of Standards and Technology (NIST) List (http://www.nsrl.nist.gov/);

vii.  Operating System files that do not store user-created content (e.g., CAT, DLL, DMP, EXE, FON, PNF, OPS, SYS, etc.); and

viii. Application source code, configuration, and other similar files necessary for the function of an application that do not store user-created content during ordinary use (e.g., BAK, BIN, CFG, DBF, DAT, JS, JSON, JAR, LUA, MSB, RES, WINNT, YTR, etc.).

c. <u>Unintentional Production of Privileged Material</u>. The unintentional production of any material constituting or containing attorney-client privileged information or work product, or constituting or containing information protected by applicable privacy laws or regulations, shall be governed by provisions contained in the Protective Order entered in this Action.

**B.      ELECTRONICALLY STORED INFORMATION**

1.  <u>Production in Reasonably Usable Form</u>

a.  The Parties shall produce electronically stored information in reasonably usable form. Except as stated in Paragraphs B.2 and B.3 below or as agreed hereafter by the Parties, such reasonably usable form shall be the single-page TIFF-image format with extracted or OCR (only if extracted text is unavailable or redactions were made) text and associated metadata set out in Attachment A, which is incorporated in full in this protocol ("TIFF-*Plus* format"). If the Receiving Party, for good cause explained in the request, seeks production in native format of specifically identified ESI produced originally in TIFF-*Plus* format, the Producing Party shall respond reasonably and in good faith to any such request. Procedures for production of a native file in response to any such request are set out in Attachment A, Paragraph A.15.b.

b.  The Parties reasonably expect that, in light of the fact that a number of document types will be produced in native format, as set forth in B. 2. below, the majority of the documents that have color content that is necessary to ascertain the meaning of the document will be provided in color. As to those documents that have color content, but are produced in black and white, the Producing party shall make

reasonable efforts, taking into account increased burden and costs of production, to identify such documents in a metadata field indicating that the original contains color (other than the incidental use of color, e.g., signature blocks and logos), as set forth in Attachment A. Upon reasonable request, the Producing Party shall provide a color copy of a specifically identified document(s) that was produced in black and white.

c.   If electronically stored information discoverable in this Action was previously produced in another legal proceeding, the Producing Party may produce that information in the format in which it was previously produced even if the format does not conform to the specifications contained in this protocol, as long as the Requesting Party has access to all metadata fields as set forth in Attachment A, other than possibly the field identifying whether the original document has color content. To the extent that Plaintiff objects to such format in which the documents were previously produced, the parties shall meet and confer and raise any unresolved issues with the Court. Other than the production format of the information, all other provisions of this protocol will govern the conduct of discovery in this case, including the scope of discovery, the identification of potential sources of information, processing, culling, search and review methodology.

2.   <u>Native Files</u>

Electronic spreadsheets (e.g., Excel), electronic presentations (e.g., PowerPoint), word processing files with tracked changes or comments (e.g., Word), desktop databases (e.g., Access),

and audio/video multimedia files shall be produced in native format as described in Paragraph A.15.a of Attachment A.

3.    <u>Enterprise Databases, Database Management Systems, and Other Structured Data ("Structured Data Systems")</u>

    a.    If discoverable data can be produced in an already existing and reasonably available report, the Producing Party may collect and produce the data in that report format in accordance with Paragraph B.1;

    b.    If an existing report form is not reasonably available, the Producing Party may make reasonable efforts to export from the original database discoverable information in a format compatible with Microsoft Excel or Microsoft Access and may produce such information in that native format.

    c.    If there is a dispute about whether production as described in subparagraph (b) is reasonably useable, the Parties shall meet and confer in an effort to identify a mutually agreeable report form.

    d.    Nothing herein shall obligate a Producing Party to create custom reports. The Parties shall meet and confer to discuss the associated cost and proportionality of any custom reporting.

4.    <u>Document Management or Enterprise Content Management Sources</u>

Where legacy hardcopy documents and writings have been scanned into a document management system and stored as image files, or where ESI document files are assembled or natively maintained within the framework of an ECM or document management system (i.e., Documentum®, OpenText®, etc.), the ESI source may have hybrid features of both structured data and unstructured data. As to such sources, the parties shall meet and confer to discuss the scope and producibility of non-privileged database fields from their corresponding database

record, if available.

5.   <u>Redactions</u>

a.   The Producing Party may redact from any TIFF image, metadata field, or native file material that is protected from disclosure by applicable privilege or immunity, that is governed by any applicable privacy law or regulation, that contains commercially sensitive or proprietary information that is not responsive to the claims and defenses in this Action (e.g., confidential business plans for a product that is not at issue in this Action), or that the Protective Order entered in this Action allows to be redacted. When a TIFF image is redacted for responsiveness, the redaction will state "Non-Responsive." In preparing document families for production, the Producing Party also may withhold entire attachments that are wholly non-responsive (e.g., documents that wholly pertain to products that are not at issue in this Action) and may produce slip sheets in their place.

b.   Each redaction in a TIFF image shall be indicated clearly. When a TIFF image is redacted for attorney-client privilege or work-product immunity, the redaction will identify that it is based on privilege.

c.   For native files requiring redaction, redacted text shall be replaced, when feasible, with the term "Redacted" or, for portions withheld on the grounds of attorney-client privilege and/or the attorney work-product immunity, "Privileged," and the Producing Party shall produce the redacted file either in the reasonably usable form set out in Paragraph B.1.a or in native format.

d.   No Party shall be required to include in a privilege log descriptions of produced documents that were redacted on the basis of attorney-client privilege and/or the

attorney work-product immunity, provided that the word "Privileged" appears on the redaction label and the privilege log contains a list of the Bates numbers of the redacted documents along with the specific claim asserted (ie., attorney-client privilege, attorney work-product immunity or both).

e.    If the Receiving Party should challenge any redaction, the Parties shall abide by the terms of the Protective Order and shall handle any such challenge in accordance with those terms.

6.    <u>Use of Native Files in Proceedings in the Case</u>

a.    To the extent that a Party seeks to use a document produced in native form in hardcopy (i.e., a paper copy), the following protocol shall apply to the Party seeking to use the natively produced document in hard copy:

    i.    When a TIFF image of the native file also was produced (*see* Paragraph B.1.a above), the Party seeking to use the document shall print the hardcopy from that TIFF image.

    ii.    When the native file was initially produced in native format (*see* Paragraph B.2 above), the Party shall:

        1.    image the native file to TIFF image or PDF file in accordance with the specifications in Attachment A, Paragraphs A.4 and A.5; and

        2.    include in the margin of each page of the TIFF image or PDF file (a) the original production number of the native file, (b) the full confidentiality designation required by the Protective Order, and (c) the text, "file produced natively".

b.      Any Party that uses a file produced in native format or a TIFF image or hardcopy document representing the original native-format file shall disclose, at the time of use, whether the file or document constitutes an accurate and complete depiction of the original native-format file or, if not, shall identify any differences between the produced native file and the document used by the Party. To the extent that there are differences, the Party seeking to use the document with a witness shall have available for the witness a copy of the original document representing the original native-format file.

c.      Summaries and Reports Created from Native File Data.

    i.      Subject to the limitations set out below, the Parties are permitted to create from produced native files summaries, extracts or reports to use as deposition exhibits. For example, a Party may run a query over a large database extract in order to isolate data believed to be relevant and may create a report from the same. Also by way of example, a Party may extract information from native spreadsheets and create printouts of the same. Summaries, extracts, or reports must be accurate representations of the original data and are not authorized if they create a potential for confusion or prejudice.

    ii.     The Party proposing to use a summary, extract or report of a native file shall disclose, prior to use of any such summary, extract or report, a description of how it was created. As applicable, the description must identify the query run and the source data set, or must identify by Bates number the spreadsheet and the columns and rows extracted from it.

d.   Nothing in this protocol waives the right of any Party to object on any and all grounds to use in any proceeding in this Action of a native file, of any altered native file, of any slipsheet or TIFF image associated with the native file, or of any summary, extract or report of a native file.

e.   To the extent that a native file is presented to a witness in its native form (i.e., from a computer or projected on a screen):

    i.   Modifications may not be made to the native version;

    ii.  The Party using the native version shall mark as an exhibit a hardcopy of the corresponding slipsheet that includes the Bates number and confidentiality designation; and

    iii. The parties shall meet and confer after its use to discuss whether or not to create a hard copy of the native file as an exhibit and, if so, the form of such hard copy exhibit

f.   Nothing in this protocol waives the right of any Party to object on any grounds to use in any proceeding in this Action of a native file, of any altered native file, of any slipsheet or TIFF image associated with the native file, or of any summary, extract or report of a native file.

7.   Data Culling and Use of Search Term Filters.

a.   To contain costs in the identification of relevant ESI for review and production, the Parties may meet and confer to discuss the use of reasonable search term filters or other culling methodologies. For these purposes, "culling" means the *exclusion or elimination* of ESI from a collection of potentially responsive information by the application of filtering criteria. If search terms are to be used as part of a proposed

culling methodology, the Parties will meet and confer regarding any search terms or other data culling procedures. If the Parties are unable to resolve any disputes over search terms through the meet-and-confer process (which may include statistical sampling of disputed terms), the Parties will submit the dispute to the Court in the form of a joint discovery letter with a discussion of the relevance and/or burden associated with the search terms in dispute.

b.      The Producing Party agrees to quality check the data that does not hit on any terms (the Null Set) by selecting a statistically valid random sample of documents from the Null Set. If responsive documents are found during the Null Set review, the Producing Party agrees to produce the responsive documents separate and apart from the regular production. The Parties will then meet and confer to determine if any additional terms, or modifications to existing terms, are needed to ensure that substantive, responsive documents are not missed.

c.      The fact that any electronic file has been identified in agreed-upon searches shall not prevent any Party from withholding such file from production on the grounds that the file is not relevant to the claims or defenses or otherwise within the scope of discovery under the Federal Rules of Civil Procedure, that it is protected from disclosure by applicable privilege or immunity, that it is governed by any applicable privacy law or regulation, that it contains commercially sensitive or proprietary non-responsive information, or that the Protective Order entered in this Action allows the file to be withheld.

d.      The Requesting Party will be entitled to reasonably propose additional search terms as new and additional relevant terms are identified, and nothing in this protocol

should be interpreted to prevent that from occurring. To the extent that the Parties do not agree regarding such additional terms after meeting and conferring, the disputed terms shall be raised with the Court.

8.    Email Threading

a.    Email threads are email communications that contain lesser-included email communications that also may exist separately in the Party's electronic document collection. A most-inclusive email is one that contains unique content and all the lesser-included emails, including attachments, that are part of the same string ("most-inclusive e-mail"). Each Party may produce (or list on any required privilege log) only the most-inclusive email threads. Following production of the most-inclusive email threads, a Receiving Party may request individual prior or lesser-included emails within the identified most-inclusive email threads, and may also request information as to whether lesser-included emails were collected from a particular custodian. The Producing Party shall cooperate reasonably in responding to any such requests if the requested lesser-included emails otherwise would have been subject to production.[2] Additionally, each Party may produce or list on any required privilege log only the most inclusive email threads and need not separately log each email contained in the chain.

b.    Participants in lesser-included emails shall be listed in the most-inclusive email's "ALL_PARTICIPANTS" field included in the data load file (*see* Attachment A,

---

[2]    To the extent that a Producing Party wishes to use a technology assisted review (TAR) process for the purposes of identifying or culling the documents to be reviewed or produced ***other than that specifically identified herein*** (e.g., the processes identified in Paragraphs B.6 and B.7), such Producing Party must notify the Receiving Party with ample time to meet and confer in good faith regarding a mutually agreeable protocol for the use of such technology or process.

Paragraph A.14.c) if the lesser-included emails otherwise would have been subject to review.

9. <u>Privilege Log</u>

    a.    Unless otherwise agreed by the Parties, within sixty (60) days of each production of documents, the Producing Party shall provide a log that identifies documents withheld in their entirety from that production on grounds of attorney-client privilege, the attorney work-product doctrine or any other privilege recognized by law ("Privileged Information").

    b.    Work product prepared after initiation of this Action by or at the direction of counsel for purposes of the litigation, privileged communications with counsel after initiation of this Action, and any other Privileged Information generated after initiation of this Action do not need to be listed on any privilege log.

10. <u>Avoidance of Duplicate Production</u>

    a.    "Duplicate ESI" means files that are exact duplicates based on the files' MD5 or SHA-1 hash values. The Producing Party need produce only a single copy of responsive Duplicate ESI. A Producing Party shall take reasonable steps to de-duplicate ESI globally (i.e., both within a particular custodian's files and across all custodians). Entire document families may constitute Duplicate ESI. De-duplication shall not break apart families. When the same Duplicate ESI exists in the files of multiple custodians, those persons shall be listed in the OTHER_CUSTODIANS field identified in Paragraph A.14.c of Attachment A.

To the extent a produced document has track changes, other non-privileged versions of that document that have been identified in connection with the collection and review process will be produced.

b.      If the Producing Party makes supplemental productions following an initial production, that Party also shall provide with each supplemental production an overlay file to allow the Receiving Party to update the OTHER_CUSTODIANS field. The overlay file shall include both all custodians listed in the OTHER_CUSTODIANS field in prior productions and any custodians newly identified in the current supplemental production.

c.      The Parties further agree that an email that includes content in the BCC or other blind copy field will not be treated as a duplicate of an email that does not include content in the BCC or other blind copy field, even if all remaining content in the email is identical.

## C.      DOCUMENTS THAT EXIST ONLY IN HARDCOPY (PAPER) FORM

A Party may produce documents that exist in the normal course of business only in hardcopy form either (a) in their original hardcopy form or (b) scanned and produced, redacted as necessary, in accordance with the procedures set out in Attachment A. The scanning of original hardcopy documents does not otherwise require that the scanned images be treated as ESI. The Producing Party shall provide the agreed-upon metadata fields pertaining to scanned documents as set forth in the metadata table in Attachment A.

Dated October 23, 2019, at Kansas City, Kansas.

 s/ James P. O'Hara
James P. O'Hara
U.S. Magistrate Judge

18

# Attachment A

A.1.     <u>Image Files</u>. Files produced in *.tif format will be single page black and white *.tif images at 300 DPI, Group IV compression. To the extent possible, original orientation will be maintained (i.e., portrait-to-portrait and landscape-to-landscape). Each *.tif image will be assigned a unique name matching the production number of the corresponding page. Such files will be grouped in folders of no more than 1,000 *.tif files each unless necessary to prevent a file from splitting across folders. If a file, e.g., a PDF file, exceeds 500 *.tif images, the Producing Party may produce the file natively rather than in *.tif format.  Files will not be split across folders and separate folders will not be created for each file. Production ("Bates") numbers shall be endorsed on the lower right corner of all images. This number shall be a unique, consistently formatted identifier that will:

   a.     be consistent across the production;

   b.     contain no special characters; and

   c.     be numerically sequential within a given file.

Bates numbers should be a combination of an alpha prefix along with an 8-digit number (e.g., ABC00000001). The number of digits in the numeric portion of the Bates number format should not change in subsequent productions. Confidentiality designations, if any, shall not obscure any portion of the original file. Bates numbers and confidentiality designations shall be repositioned as needed to ensure that no portion of the original file is obscured by their placement on any .tif conversion.

A.2.     <u>File Text</u>. Except where ESI contains text that has been redacted under assertion of privilege or other protection from disclosure or where there is some other technical reason why a file's full text cannot reasonably be extracted, full text will be provided in the format of a single *.txt file for each file (i.e., not one *.txt file per *.tif image). Where ESI contains text that has not been extracted for one of the reasons set forth above, the available *.tif image will be OCR'd and

1

# Attachment A

file-level OCR text will be provided in lieu of extracted text. Searchable text will be produced as file-level multi-page UTF-8 text files with the text file named to match the beginning production number of the file. The full path of the text file must be provided in the *.dat data load file.

A.3.     <u>Word Processing Files</u>. If word processing files, including without limitation Microsoft Word files (*.doc and *.docx), are produced in *.tif image format, such *.tif images will display tracked changes, comments and hidden text.

A.4.     <u>Presentation Files</u>. If presentation files, including without limitation Microsoft PowerPoint files (*.ppt and *.pptx), are produced in *.tif image format, such *.tif images will display comments, hidden slides, speakers' notes, and similar data in such files.

A.5.     <u>Spreadsheet or Worksheet Files</u>. If spreadsheet files, including without limitation Microsoft Excel files (*.xls or *.xlsx), are produced in *.tif image format, such *.tif images will display hidden rows, columns and worksheets, if any, in such files, if reasonably technologically feasible.

A.6.     <u>Parent-Child Relationships</u>. Parent-child relationships (e.g., the associations between emails and their attachments) will be preserved. Email and other ESI attachments will be produced as independent files immediately following the parent email or ESI record. Parent-child relationships will be identified in the data load file pursuant to Paragraph A.13 below.

A.7.     <u>Dynamic Fields</u>. Files containing dynamic fields such as file names, dates, and times will be produced showing the field type (e.g., "[FILENAME]" or "[AUTODATE]"), rather than the values for such fields existing at the time the file is processed.

A.8.     <u>English Language</u>. To the extent any data exists in more than one language, the data will be produced in English, if available. If no English version of a file is available, the Producing Party shall not have an obligation to produce an English translation of the data.

2

# Attachment A

A.9.   <u>Embedded Objects</u>. Some Microsoft Office and .RTF files may contain embedded objects. Such objects typically are the following file types: Microsoft Excel, Word, PowerPoint, Project, Outlook, and Access; and PDF. Subject to claims of privilege and immunity, as applicable, objects with those identified file types shall be extracted as separate files if reasonably technologically feasible and shall be produced as attachments to the file in which they were embedded. If the file with the embedded object is produced in native format, the embedded object need not be extracted.

A.10.   <u>Replacement Files</u>. Any documents that are replaced in later productions shall be clearly designated as such, by appending a "-R" to the production prefix and by a letter accompanying the production clearly designating such documents as replacements.

A.11.   <u>Compressed Files</u>. Compressed file types (i.e., .CAB, .GZ, .TAR. .Z, .ZIP) shall be decompressed in a reiterative manner to ensure that a zip within a zip is decompressed into the lowest possible compression resulting in individual files. To the extent such individual files included in compressed files are attached to other individual files within the compressed files, that "parent-child" relationship will be indicated in the appropriate fields in the metadata that is included with Attachment A ("metadata table").   In addition, the "Folder" field in the metadata table shall indicate the file-path information for the documents that were compressed.

A.12.   <u>Scanned Hardcopy Documents.</u>

a.   In scanning hardcopy documents, multiple distinct documents should not be merged into a single record, and single documents should not be split into multiple records (i.e., hardcopy documents should be logically or physically unitized).

b.   For scanned images of hardcopy documents, OCR should be performed on a document level and provided in document-level *.txt files named to match the production number of the first page of the document to which the OCR text

3

# Attachment A

corresponds. OCR text should not be delivered in the data load file or any other delimited text file.

c.    In the case of an organized compilation of separate hardcopy documents—for example, a binder containing several separate documents behind numbered tabs— the document behind each tab should be scanned separately, but the relationship among the documents in the binder should be reflected in proper coding of the family fields set out below.

A.13.   Production Numbering.

In following the requirements of Paragraph A.1, the Producing Party shall take reasonable steps to ensure that attachments to documents or electronic files are assigned production numbers that directly follow the production numbers on the documents or files to which they were attached. If a production number or set of production numbers is skipped, the skipped number or set of numbers will be noted. In addition, wherever possible, each *.tif image will have its assigned production number electronically "burned" onto the image.

A.14.   Data and Image Load Files.

a.    Load Files Required. Unless otherwise agreed, each production will include a data load file in Concordance (*.dat) format produced in ASCI and an image load file in Opticon (*.opt) format.

b.    Load File Formats.

i.    Load file names should contain the volume name of the production media. Additional descriptive information may be provided after the volume name. For example, both ABC001.dat or ABC001_metadata.dat would be acceptable.

4

# Attachment A

ii.      Unless other delimiters are specified, any fielded data provided in a load file should use Concordance default delimiters. Semicolon (;) should be used as a multi-entry separator.

iii.     Any delimited text file containing fielded data should contain in the first line a list of the fields provided in the order in which they are organized in the file.

c.   <u>Fields to be Included in Data Load File</u>. For all documents or electronic files produced, the following metadata fields for each document or electronic file, if available at the time of collection and processing and unless such metadata fields are protected from disclosure by attorney-client privilege or work-product immunity or otherwise prohibited from disclosure by law or regulation, will be provided in the data load file pursuant to subparagraph (a). The term "Scanned Docs" refers to documents that are in hardcopy form at the time of collection and have been scanned into *.tif images. The term "Email and E-Docs" refers to files that are in electronic form at the time of their collection, irrespective of the form (TIFF-Plus or native format) in which they are produced.

| Field | Sample Data | Scanned Docs | Email and E-Docs | Comment |
|---|---|---|---|---|
| PRODBEG [Key Value] | ABC00000001 | Yes | Yes | Beginning production number |
| PRODEND | ABC00000008 | Yes | Yes | Ending production number |
| PRODBEGATT | ABC00000009 | Yes | Yes | Beginning production number of parent in a family |
| PRODENDATT | ABC00001005 | Yes | Yes | Ending production number of last page of the last attachment in a family |
| CUSTODIAN | Smith, John | Yes | Yes | Custodian(s) that possessed the document or electronic file—multiple custodians separated by semicolon |
| THREAD CUSTODIANS | Smith, John Birch, Janice Maple, Frank | N/A | Yes | All custodians of lesser included emails that are subject to review |

5

# Attachment A

| Field | Sample Data | Scanned Docs | Email and E-Docs | Comment |
|---|---|---|---|---|
| OTHER_CUSTODIANS | Doe, Jane; Jones, James | N/A | Yes | When global de-duplication is used, these are custodians whose file has been de-duplicated |
| NATIVEFILE | Natives\001\001\ABC 00000001.xls | N/A | Yes | Path and file name for native file on production media |
| FILEDESC | Microsoft Office 2007 Document | N/A | Yes | Description of the type file for the produced record |
| FOLDER | \My Documents\Document1.doc | Yes where applicable | Yes | Original source folder for the record produced. |
| FILENAME | Document1.doc | N/A | Yes | Name of original electronic file as collected. |
| DOCEXT | DOC | N/A | Yes | File extension for email or e-doc |
| PAGES | 2 | Yes | Yes | Number of pages in the produced document or electronic file (not applicable to native file productions). |
| AUTHOR | John Smith | N/A | Yes | Author information as derived from the properties of the document |
| DATECREATED | 10/09/2005 | N/A | Yes | Date that non-email file was created as extracted from file system metadata |
| DATELASTMOD | 10/09/2005 | N/A | Yes | Date that non-email file was modified as extracted from file system metadata |
| SUBJECT | Changes to Access Database | N/A | Yes | "Subject" field extracted from email message or metadata properties of the document |
| FROM | John Beech | N/A | Yes | "From" field extracted from email message |
| TO | Janice Birch | N/A | Yes | "To" field extracted from email message |
| CC | Frank Maple | N/A | Yes | "Cc" or "carbon copy" field extracted from email message |
| BCC | John Oakwood | N/A | Yes | "Bcc" or "blind carbon copy" field extracted from email message |
| DATESENT | 10/10/2005 | N/A | Yes | Sent date of email message (mm/dd/yyyy format) |
| TIMESENT | 10:33 am | N/A | Yes | Sent time of email message, time zone set to GMT |
| DATERCVD | 10/10/2005 | N/A | Yes | Received date of email message (mm/dd/yyyy format) |

# Attachment A

| Field | Sample Data | Scanned Docs | Email and E-Docs | Comment |
|---|---|---|---|---|
| TIMERCVD | 10:33 am | N/A | Yes | Received time of email message, time zone set to GMT |
| ALL_PARTICIPANTS | John Beech, Janice Birch, Frank Maple | N/A | Yes | For emails only; lists all participants in lesser-included emails that, without email threading, would have been subject to review |
| CONFIDENTIALITY | CONFIDENTIAL | Yes | Yes | Text of confidentiality designation, if any |
| TEXTPATH | Text\001\001\ABC00000001.txt | Yes | Yes | Path to *.txt file containing extracted or OCR text |
| FILE_PRODUCED_IN_NATIVE_AND_TIFF | Yes | N/A | YES | Limited to documents reproduced in native format |
| MD5_HASH | 309997447f.....  . | N/A | Yes | MD5 Hash value for ESI |
| PRODVOL | VOL001 | Yes | Yes | Name of the Production Volume |
| CONVERSATION INDEX | 01D3B6FE9A15E106D0C23E0E45B3B084573C073F61BA | N/A | Yes | The metadata unique to an email chain |
| REDACTED REASON | Privilege | Yes | Yes | Notes the reason a file was redacted |
| EMAIL FOLDER PATH | JSMITH.pst\Top of Personal Folders\Projects\ | N/A | Yes | Original location of an email in custodian's email box |
| FILES SIZE | 1257.00 | N/A | Yes | Size of File |
| COLOR | Y/N | Yes | Yes | Denotes that the collected document contains color in the original that is not incidental (e.g., signature blocks and logos) |

A.15.   <u>Files Produced in Native Format</u>.

     a.     For any electronic file produced initially as a native file in accordance with Paragraph B.2 of the protocol above, the file shall be given a file name consisting of a unique Bates number and, as applicable, a suitable confidentiality designation; for example, "ABC00000002_Confidential." For each such native file, the production will include a *.tif image slipsheet (i) indicating the production number of the native file, (ii) with respect to any confidential document, setting forth the

7

# Attachment A

full confidentiality language applicable to the native file as set out in the protective order, and (iii) stating "File Provided Natively." To the extent that it is available, the original or redacted file text shall be provided in a file-level multi-page UTF-8 text file with a text path provided in the *.dat file; otherwise the text contained on the slipsheet shall be provided in the *.txt file with the text path provided in the *.dat file.

b.   For any electronic file produced in native file format following production of a TIFF image in accordance with Paragraph B.1, the file shall be given a file name consisting of (i) the Bates number of the first page of the associated TIFF image and (ii) as applicable, a suitable confidentiality designation. For each such native file, the production will include a new .DAT file (i) indicating the production number of the native file, (ii) identifying the path to the native file, (iii) adding a field stating "Yes," indicating that the file was produced in both native and TIFF formats, and (iv) linking the metadata associated with the originally produced TIFF image to the newly produced native file.

A.16.   <u>Production Media</u>. Unless otherwise agreed, documents and ESI will be produced on optical media (CD/DVD), external hard drive, secure FTP site, or similar electronic format. Such media should have an alphanumeric volume name; if a hard drive contains multiple volumes, each volume should be contained in an appropriately named folder at the root of the drive. Volumes should be numbered consecutively (ABC001, ABC002, etc.). Deliverable media should be labeled with the name of this Action, the identity of the Producing Party, and the following information: Volume name, production range(s), and date of delivery.

# Attachment A

A.17.   <u>Encryption of Production Media</u>. To maximize the security of information in transit, any media on which documents or electronic files are produced may be encrypted by the Producing Party. In such cases, the Producing Party shall transmit the encryption key or password to the Receiving Party, under separate cover, contemporaneously with sending the encrypted media. The Receiving Parties in this Action are on notice that certain data produced may originate from custodians in the European Union and the Receiving Parties therefore agree to follow the strictest security standards in guarding access to said data.

A.18.   <u>Non-Viewable Documents That the Producing Party Has A Reasonable Good Faith Belief Would Contain Responsive Information</u>. - During document review, certain documents are opened that are not viewable in the default HTML rendered format. In such instances, the Producing Party shall attempt to create a *.tif image with a viewable image. If unsuccessful, the Producing Party shall attempt to open the document with a native viewer. If the file cannot be viewed via any of these methods, the Producing Party shall  (i) produce a slip sheet in lieu of the document that identifies the document as a technical exception, (ii) identify the file in a log of "technical exceptions" to be produced to the Receiving Party and (iii) maintain the native file for request for production or review by the Receiving Party in accordance with this Order. The parties shall meet and confer to discuss reasonable steps, if any, that may be taken with respect to specific documents on the technical exceptions log.